UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
LYNNETTE MYERS,                         )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )        Civil Action No. 15-10105-JCB
                                        )
CAROLYN W. COLVIN,                      )
Acting Commissioner of Social Security, )
                                        )
        Defendant.                      )
_____)

ORDER ON MYERS' MOTION FOR ORDER REVERSING THE
COMMISSIONER'S DECISION AND DEFENDANT'S MOTION
TO AFFIRM THE COMMISSIONER'S DECISION
[Docket Nos. 21, 27]

November 5, 2015

Boal, M.J.

        This is an action for judicial review of a final decision by the Acting Commissioner of the

Social Security Administration ("Commissioner") denying Lynnette Myers' ("Myers" or

"Plaintiff") applications for disability insurance benefits ("DIB") and supplemental security

income ("SSI") benefits.  Myers asserts that the Commissioner's decision denying her such

benefits – memorialized in a September 26, 2013 decision of an administrative law judge

("ALJ") – is in error, [Docket No. 21], and the Commissioner, in turn, has moved to affirm

[Docket No. 27].[1]  For the following reasons, the Court remands the case to the Commissioner

_____

[1] On May 18, 2015, the parties consented to the exercise of jurisdiction by a United States
Magistrate Judge for all purposes, Docket No. 18, and the case was reassigned to the undersigned
on May 19, 2015.  Docket No. 20.

pursuant to sentence four of 42 U.S.C. § 405(g) for further findings and/or proceedings consistent with this opinion.

I.      FACTS AND PROCEDURAL HISTORY

        A.      Procedural History

        Myers filed an application for DIB and SSI on May 26, 2011.  (Administrative Record ("AR") 190-191, 294-310).  She alleged disability beginning March 30, 2009, due to right shoulder problems, right arm problems, bipolar disorder, high blood pressure, and circulation problems.  (AR 190-191, 342).  She later amended the alleged onset date to May 1, 2010.  (AR 83, 337).  Her application was denied initially and upon reconsideration.  (AR 136-159, 160-189, 190-193).

        A hearing was held before ALJ Sean Teehan on June 20, 2013.  (AR 79-135).  On September 26, 2013, the ALJ issued a decision finding Myers not disabled.  (AR 20-34).  On November 17, 2014, the Appeals Council denied Myers' request for review (AR 1-7), making the ALJ's decision the final decision of the Commissioner.

        Myers filed this action on January 16, 2015.  Docket No. 1.

        B.      Background

        Myers was 43 years old on her alleged onset date.  (AR 31).  She had an eighth grade education.  (AR 31, 84-85).  She tried to obtain a GED but was unable to do so.  (AR 85).  Myers had past relevant work as a prep cook and caterer helper.  (AR 31, 85-86).[2]  She last worked in 2009.  (AR 86).

---

[2] The ALJ noted that the vocational expert also indicated that Myers had worked as a security guard.  However, she performed that job on a part time basis.  Therefore, the ALJ found that she had not performed security guard work at a substantial gainful level and did not include it in Myers' past relevant work.  (AR 31).

C.     The Medical Evidence

In June 2010, Myers reported right-sided neck and shoulder pain with intermittent paresthesias of the right upper extremity, which had persisted for the previous month.  (AR 468).  On examination, she had moderate pain on palpation of the proximal trapezius, full range of motion of the neck, normal strength in the right upper extremity, no tenderness, and intact sensation.  (AR 468-469).  In July, she was referred to physical therapy for pain in her right shoulder with movement.  (AR 466).

In August 2010, Myers reported depression, trouble concentrating and sleeping, memory issues, isolating behavior, decreased energy, and a history of difficulty working with people. (AR 566).  She was diagnosed with rule out for bipolar disorder, and bipolar disorder mixed with depression.  (AR 566).  Her treatment plan consisted of individual therapy and a psychopharmaceutical evaluation.  (AR 566).  In March 2011, Myers was discharged from mental health treatment because she had not returned within six months.  (AR 559).

In July 2011, Myers underwent a psychiatric evaluation by Dr. Margaret Riley.  (AR 514).  She reported that she was "not happy at all," had racing thoughts, anxiety attacks, nightmares, shame and embarrassment, a history of rape, inability to read and write, poor memory, nightmares, problematic sleep, and a history of panic attacks.  (AR 514-515).  She was diagnosed with bipolar disorder, post-traumatic stress disorder ("PTSD"), panic attacks with agoraphobia and overall mild symptoms. (AR 515).  She was started on treatment with Ativan, Lamictal, and Trazadone.  (AR 515).  She was also given Lorazepam to use as needed for panic attacks.  (Id.).

On July 25, 2011, upon physical examination, she had normal range of motion and strength, and no joint enlargement or tenderness in both of her lower extremities and left arm.

(AR 545).  She had 4/5 muscle strength, normal range of motion, no joint deformity, and no swelling in her right upper extremity.  (AR 545).  She reported walking five times per week. (AR 545).  She was assessed with possible cervical disc arthritis and advised to begin physical therapy.  (AR 550).  Upon mental examination, her judgment and insight were intact; she was oriented to time, place, and person, her memory was intact for recent and remote events, and her mood and affect reflected no depression, anxiety, or agitation.  (AR 545).  In August 2011, she was doing ok with medication; her sleep was better; her mood was calmer; and she was alert, coherent, and goal directed.  (AR 516).

In September 2011, state agency physician Dr. Gopal reviewed the record and concluded that Myers would be capable of light work, including standing and/or walking and sitting for six hours in an eight hour day.  (AR 142).  Among other limitations, he also found that she was limited to reaching in front and/or laterally and overhead.  (AR 142-143).

In October 2011, Myers underwent a consultative examination with psychologist Dr. Scott Haas.  (AR 571-575).  During that examination, she presented cooperatively, but was disengaged.  (AR 571).  Her attention and concentration were adequate at all times during the interview.  (AR 571).  Her judgment and insight were fair to adequate, with compromise secondary to possible under-socialization.  (AR 571).  Dr. Haas believed she may or may not be capable of completing forms, responding to 2 or 3-step instructions, or following instructions. (AR 574).  He also indicated that she appeared to need supervision or assistance to perform activities of daily living, but that could be due to withholding or under socialization rather than cognitive limitations.  (AR 574).

In that same month, treating physician Dr. Margaret Riley completed a form in which she indicated that Myers was alert, coherent, calm, and rational.  (AR 495).  She also indicated that

Myers would need excessive supervision due to illiteracy, frustration, poor ability to make decisions, and episodes of psychiatric symptoms.  (AR 496).  Dr. Riley indicated that Myers tended to withdraw and keep to herself, became anxious around people, and had mild panic attacks.  (AR 496).

Eight days after Dr. Riley's opinion, state agency psychologist John Burke reviewed the record and found that Myers could understand and remember simple instructions.  (AR 144). He also found she was not significantly limited in her ability to carry out very short and simple instructions, but moderately limited in her ability to carry out detailed instructions.  (Id.).  He also found that she could focus and attend to simple tasks in structured and low stress task settings, and would benefit from minimal supervision.  (Id.).  He indicated that Myers's ability to accept instructions and respond appropriately to criticism from supervisors was not ratable on available evidence.  (AR 145).  She was moderately limited in her ability to interact appropriately with the general public.  (AR 144).

During an October 2011 consultative examination with Dr. Madhusudan Thakur, Myers reported difficulty in sitting and walking, and in moving her neck sideways.  (AR 576-577).  Dr. Thakur assessed cervical radiculopathy due to spinal root compression.  (AR 578).  He believed Myers would be unable to lift any heavy objects with her right arm, and would have difficulty in sitting and walking because of the pain in her neck and arm.  (AR 578).

A treatment note in November 2011 indicated that Myers's gait and station were normal and that she could undergo exercise testing and/or participate in an exercise program.  (AR 505). In December 2011, she reported that physical therapy kept her pain at a minimum. (AR 584).

In March 2012, state agency physician Rosario Palmeri echoed Dr. Gopal's findings. (AR 168-169).  In May 2012, state agency psychologist Joan Kellerman concurred with Dr. Burke's findings.  (AR 171).

In August 2012, Myers complained of pain in her right shoulder, neck pain, and pain in both knees.  (AR 536).  In October, she reported ongoing pain in her knees, which was worse with prolonged sitting and standing.  (AR 655).  Her examination showed normal range of motion in the right and left upper extremities, mild patella swelling without erythema or pain with palpation, no effusion, and crepitus on flexion and extension.  (AR 656).  An x-ray of her knees revealed minimal degenerative changes pronounced in the right knee joint in the patelofemoral compartment with no erosions or definite loss of cartilage.  (AR 652).  She was advised to apply ice, take Tylenol, and use prescribed Ultram for break-through pain.  (AR 656). In December 2012, her knee pain was well-managed with as-needed Ultram.  (AR 647).

Myers continued to report ongoing right shoulder and knee symptoms while her examinations remained unchanged through April 2013.  (AR 641, 642, 645, 633).  She complained that physical therapy was not helping, although Ultram had some effect.  (AR 634, 640).  An MRI of her right knee in May 2013 showed cartilage loss along the lateral and medial facet of the patella; focal moderate loss of cartilage of the medial femoral condyle; myxoid degeneration of medial meniscus with mild extrusion; a small baker cyst; and small suprapatellar joint effusion, and fluid hyperintensity of Hoffa's fat pad, specific for synovitis.  (AR 696).

Also in May 2013, her gait and station were intact.  (AR 613).  Later in the month, she complained of ongoing pain in her right shoulder, knees, and swelling in her left arm.  (AR 595). Treating nurse practitioner LaurenWasley indicated that Dr. Oladipo recommended an MRI and surgery for knee pain and that Dr. Oladipo was to follow Myers.  (AR 596).  On May 13, 2013,

Ms. Wasley completed a questionnaire in which she indicated, among other limitations, that Myers could only reach occasionally and must periodically alternate sitting and standing to relieve pain and discomfort.  (AR 669-670).  She further wrote that Myers' chronic pain contributed to her worsening depression.  (AR 670).

  D. <u>Hearing Testimony</u>

  At the hearing, Myers testified that pain in her right shoulder and knees were affecting her ability to lift, stand and walk.  (AR 93).  She also testified that her right knee was worse than her left and that it locked on her a lot.  (AR 94).

  Myers also testified that she was about to have surgery on her right knee and cervical spine surgery.  (AR 94).

  In addition, Myers stated that she has bipolar disorder, which also affects her ability to work.  (AR 97).  She takes lithium and anxiety medication and is undergoing counseling.  (AR 97).

  Myers stated that she "can read a little bit, but not like I should be able to."  (AR 104).  She can read "simple words like 'I am'" but not the "big words."  (AR 105).  She cannot read the newspaper but is able to read the ingredients in a box of food.  (AR 106).  She stated that she can write but does not have good writing.  (<u>Id.</u>).  She may be able to leave a note for someone to tell them that she is out doing something.  (<u>Id.</u>).  She had some difficulty passing the written driver's license test but was able to pass the second time she took it.  (AR 107).

  She indicated that her daughter reads her mail and helps her fill out forms.  (AR 103).  She also stated that her daughter filled out her social security applications, function reports, and work history reports.  (AR 105).

Myers stated that her high blood pressure medication and lithium make her urinate a lot, sometimes "almost every 20 minutes."  (AR 113).

Vocational expert Dr. James Scorzelli testified that Myers had relevant past work as a prep cook, which was medium, unskilled work.  (AR 119).  She also had past work as a caterer helper, which was light, semi-skilled work.  (Id.).  The ALJ asked Dr. Scorzelli the following hypothetical question:

> Q.  Assume, if you will, that a hypothetical person is of the same age, education, language, and work background as the claimant.  Further assume this is a right-hand dominant person.  And assume if this person could perform work, it'd be subject to the following limitations.  This person would be able to lift and carry 20 pounds occasionally, 10 pounds on a frequent basis; would be able to sit for six hours out of an eight-hour workday; stand and/or walk for four hours out of an eight-hour workday; would occasionally be able to climb stairs and ramps, never ropes, ladders, and scaffolds; would occasionally be able to balance, stop, crouch, and crawl.  This person would not be able to kneel.  This person would be able to only occasionally reach vertically and horizontally with the right upper extremity.  This person would be able to frequently perform fine manipulation with right upper extremity and occasionally gross manipulation with the right upper extremity; would occasionally be able to push and pull with the right upper extremity.  This person would be able to understand the [sic] carry out two to three-step tasks; would be able to maintain concentration, persistence, and pace in the performance of those tasks for two-hour increments over an eight-hour workday over a 40-hour workweek.  This person would have to avoid even moderate exposure to unprotected heights and would be able to relate to coworkers, supervisors, and the public on a superficial interactional basis.
>
> A.  Yes.
>
> Q.  This person would be able to deal with only minor changes in the workplace.  Would such a person be able to perform any of the claimant's past relevant work or any other work in the regional or national economy?

(AR 119-121).  Dr. Scorzelli testified that such a person would be able to perform the jobs of call-out operator, of which there are 268 jobs in Massachusetts and 19,900 jobs in the nation; of

surveillance systems monitor person, of which there are 135 jobs in Massachusetts and 2,600 in the nation; and escort vehicle driver, of which there are 204 jobs in Massachusetts and 12,600 in the nation.  (AR 121-122).

The ALJ also posed the following hypothetical to Dr. Scorzelli:

> Q.  Okay.  All right.  Now, assume, if you will, that our second hypothetical person had the following limitations.  This person would be able to occasionally lift less than 10 pounds and frequently lift less than 10 pounds.   This person would be able to stand and/or walk for less than two hours in an eight-hour workday; would be able to sit - - would have no restrictions in sitting except that this person must periodically alternate between sitting and standing.  This person would occasionally be able to push and pull with the right upper extremity and the right lower extremity; would occasionally be able to climb ramps, stairs, ladders, ropes, and scaffolds; would occasionally be able to balance and kneel, crawl, and stoop; and would never be able to crouch.  This person would be limited to occasional reaching with the right upper extremity. And in addition, this person would be limited to understanding and carrying out two to three-step tasks; would be able to maintain concentration, persistence, and pace in the performance of those tasks for two-hour increments over an eight-hour workday over a 40-hour workweek; would be able to relate to coworkers, supervisors, and the public on a superficial interactional basis; and would be able to deal with minor changes in the workplace.

> A.  Yes.

> Q.  Would such a person be able to perform any work in the regional or national economy?

(AR 122-124).  Dr. Scorzelli testified that such a person would be able to perform the same jobs mentioned before, except for the job of escort vehicle driver.

In response to Myers' counsel questions, Dr. Scorzelli testified that if a requirement of very limited reading and writing were added to the hypotheticals, such a claimant would not be able to perform the job of call-out operator but would be able to perform the jobs of vehicle escort driver and surveillance systems monitor.  (AR 129).  He also testified that if the

hypothetical claimant were to have to take a bathroom break approximately every twenty to forty minutes that would take five minutes or less, that would eliminate all jobs.  (AR 130).

Myers' counsel also tried to examine Dr. Scorzelli regarding the source for the numbers of jobs available in the region and nation.  The following exchange took place:

> Q.      Okay.  And finally, the numbers that you cited, where are those being drawn from?
>
> A.      Yeah, take a look.
>
> Q.      This is from the specific occupational unskilled cortically - -
>
> A.      Yeah.
>
> Q.      Quarterly?
>
> A.      Well, look at the resources.
>
> Q.      Can you describe for me what exactly that is?
>
> A.      Well, if you look at the resources, it says - - I mean, basically, the sources of information they say it comes from county business patterns, occupation employment statistics, the North American [INAUDIBLE] classifications, employment protection programs, Bureau of Labor Statistics, Specific Occupational Selective Manual, and the Standard Occupational Classification.  This is a source.  I have a source and they claim that they get their information from these sources.
>
> Q.      Okay.  So, you're just taking the number directly from there?
>
> A.      I'm taking the numbers from this piece of paper.  And this piece of paper, if you read this carefully, of all the sedentary jobs in Massachusetts, there are only seven that have more than 100 employees.  There are only seven sedentary, unskilled jobs in Massachusetts that have 100 or more employees.  Everything else could be less than 100 employees.  And I just identify jobs that only have 100 employees or more.
>
> Q.      So, you - -

A.          And a job that has less than 100 employees I don't even
            mention.  So, even though this has many jobs listed, as you can
            see by these pages –

Q.          Uh-huh.

A.          - - there's only seven that has 100 or more employees.

Q.          Now - -

A.          So, you know - -

Q.          - - are you aware of how they come up with those numbers?

ALJ:        That's not - -

VE:         I assume - -

ALJ:        - - proper - - no - -

VE:         Oh - -

ALJ:        That's not a proper question.  Next question.

VE:         Well, I - - oh, I don't know, forget it, okay.  This is my - -
            anyway, that's my source.

ATTY:       You take the numbers directly from there?

VE:         Yeah, from my source.  That's where I can get them.  I but this
            from a - - from that publisher.  And I believe that they give you
            correct information.

ALJ:        Okay.

ATTY:       How do you know that those numbers are correct?  Have you
            done any independent verification?

VE:         Well, my - -

ALJ:        That's an improper question.  Move on.

ATTY:       Your honor, I have to object.  I think in terms of the numbers
            that he is asking you to rely upon at step five, there needs to be
            some way to verify the accuracy.  He's here as an expert.

| ALJ: | Your objection's overruled. |
| ATTY: | I understand. |
| ALJ: | Okay? |
| ATTY: | I have no further questions then. |

(AR 131-134).

## II.   STANDARD OF REVIEW

A court may not disturb the Commissioner's decision if it is grounded in substantial evidence.  See 42 U.S.C. §§ 405(g) and 1383(c)(3).  Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion.  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  The Supreme Court has defined substantial evidence as "more than a mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (citation and internal quotation marks omitted).

The resolution of conflicts in evidence and the determination of credibility are for the Commissioner, not for doctors or the courts.  Rodriguez, 647 F.2d at 222; Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 141 (1st Cir. 1987).  A denial of benefits, however, will not be upheld if there has been an error of law in the evaluation of a particular claim.  See Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996).  In the end, the court maintains the power, in appropriate circumstances, "to enter . . . a judgment affirming, modifying, or reversing the [Commissioner's] decision, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

III.     DISCUSSION

An individual is entitled to DIB benefits if, among other things, she has an insured status and, prior to its expiration, is disabled.  See 42 U.S.C. § 423(a)(1)(A) and (E).  Entitlement to SSI, on the other hand, requires a showing of both disability and financial need.  See 42 U.S.C. § 1381a.  Myers' need, for purposes of SSI, and her insured status, for purposes of DIB, are not challenged.

A.     Disability Standard And The Commissioner's Decision

The Social Security Act (the "Act") defines disability, in part, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  See also 42 U.S.C. § 1382c(a)(3)(A) (similar).  An individual is considered disabled under the Act

> only if his physical and mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  See generally Bowen v. Yuckert, 482 U.S. 137, 146-49 (1987).

In determining disability, the Commissioner follows the five-step protocol described by the First Circuit as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a severe impairment?  A "severe impairment" means an impairment "which significantly limits the claimant's physical or mental capacity to perform basic work-related functions." If he does not have an impairment of at least this degree of severity, he is automatically not disabled.

Third, does the claimant have an impairment equivalent to a specific list of impairments in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.

. . . .

Fourth . . . does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.

Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so he is disabled; if not he is not disabled.

Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

At step one, the ALJ found that Myers had not engaged in substantial gainful activity since May 1, 2010, the alleged onset date. (AR 22). At step two, the ALJ found that Myers has the following severe impairments: cervical degenerative disc disease, degenerative joint disease of the right knee, bipolar disorder, and anxiety disorder. (AR 23). At step 3, the ALJ found that Myers' impairments did not meet or medically equal any entry on the Listing of Impairments. (AR 23). In assessing residual functional capacity, the ALJ found that Myers, a right hand dominant person, had the following residual functional capacity: she could lift and carry 20 pounds occasionally and 10 pounds on a frequent basis; sit for 6 hours out of an 8-hour workday, stand and walk for 4 hours out of an 8-hour workday; occasionally climb ramps and stairs, balance, stoop, crouch, and crawl, but never climb ladders and scaffolds or kneel; only occasional reaching vertically and horizontally with the right upper extremity; frequently could perform fine manipulation with the right upper extremity and occasional gross manipulation; occasional pushing and/or pulling with the right upper extremity; and she should avoid even moderate exposure to unprotected heights. Further, she would be able to understand and carry out 2-3 step tasks and maintain concentration, persistence, and pace in the performance of these tasks for 2-hour increments over an 8-hour workday, 40-hour workweek. Additionally, she is able to relate to coworkers, supervisors, and the public on a superficial interactional basis, and is

able to deal with only minor changes in the workplace.  (AR 25).  At step four, the ALJ found

that Myers could not perform her relevant past work.  (AR 31).  At step five, the ALJ found that,

considering Myers' age, education, work experience and residual functional capacity, there are

jobs that exist in significant numbers in the national economy that she could perform. (AR 31).

Accordingly, the ALJ found that Myers was not disabled.  (AR 34).

> B.     The ALJ's Residual Functional Capacity
>        Assessment Is Supported By Substantial Evidence

Myers first argues that the ALJ wrongly assessed her residual functional capacity

("RFC") and, therefore, presented an inaccurate hypothetical to the vocational expert.  Docket

No. 21 at 4-13.  The Court disagrees.

Although determination of a claimant's RFC is an administrative decision that is the

responsibility of the Commissioner, see 20 C.F.R. § 404.1527(e)(2), SSR 96-5p, 1996 WL

374183, at *2, an ALJ, as a lay person, cannot interpret a claimant's medical records to

determine her RFC.  Manso-Pizarro, 76 F.3d at 17.  An ALJ must rely to some degree on RFC

evaluations from a physician or another expert.  Id. at 17-18.  This does not mean, however, "that

there must always be some super-evaluator, a single physician who gives the factfinder an

overview of the entire case."  Evangelista, 826 F.2d at 144.  Rather, "an ALJ is entitled to piece

together the relevant medical facts from the findings of multiple physicians."  Mulkerron v.

Astrue, No. 09-10998-RGS, 2010 WL 2790463, at *9 (D. Mass. July 15, 2010) (quotations

omitted).  In other words, although an ALJ cannot ab initio interpret medical records to

determine a claimant's RFC, he can "render[] common-sense judgments about functional

capacity based on medical findings."  Gordils v. Sec'y of Health and Human Servs., 921 F.2d

327, 329 (1st Cir. 1990).  Thus, observations from medical sources which do not explicitly

address functional limitations can still inform an ALJ's RFC determination, "as long as the

[ALJ] does not overstep the bounds of a lay person's competence and render a medical judgment." Id.

First, Myers takes issue with the ALJ's assessment of the limiting effects of her shoulder impairment. Specifically, the ALJ found that Myers could occasionally reach with the right upper extremity. (AR 25). Myers argues that although the state agency physicians reported that she is limited in her ability to reach frontally, laterally, and overhead, they did not state that she could perform such reaching activities occasionally. Docket No. 21 at 7. However, Nurse Wasley did find that Myers could reach occasionally. (AR 670). Myers argues that Nurse Wasley's opinion cannot be the basis for the ALJ's opinion because he "specifically rejected Ms. Wasley's opinions." Docket No. 21 at 7, n. 2. Myers mischaracterizes the ALJ's decision. The ALJ did consider Nurse Wasley's opinion although he gave it little weight. (AR 29-30).

Myers also argues that there is no support for the ALJ's evaluation of her knee impairments. Docket No. 21 at 7. Neither of the state agency non-examining physicians was aware of Myers' knee impairments. Id. Thus, Myers argues that the state agency physicians' opinions could not substantially support the ALJ's RFC finding. Id. at 8.

The ALJ, however, acknowledged that Myers had submitted additional evidence regarding her right knee after the state agency physicians rendered their opinions. (AR 29). Therefore, the ALJ included additional limitations in standing, walking, and postural limitations in his RFC finding. (Id.). Those limitations are supported by substantial evidence in the record. Myers' knee impairment was treated conservatively. (AR 27, 656). She reported that her knee pain was relieved by Naproxen and Flexeril. (AR 368). She also admitted that on a typical day she went walking; her gait was repeatedly observed as normal; she was able and did participate in an exercise program; and she improved with treatment. (AR 369, 503, 505, 511, 532, 538,

545, 584-585).  Although Myers testified that she was referred for knee surgery and one

treatment note mentioned this possibility, there is no evidence in the record of any scheduled

surgery.  (AR 27-28, 596).  Accordingly, the ALJ made a proper common sense judgment

regarding Myers' knee that is supported by substantial evidence.

In addition, Myers challenges the ALJ's decision to give little weight to Nurse Wasley's

opinion that Myers was limited to standing and walking for less than two hours per day, and

needed a sit/stand option.  Docket No. 21 at 8-9.  The ALJ provided an adequate explanation for

giving little weight to Nurse Wasley's opinion.  He noted that Nurse Wasley could only attest to

Myers' medical condition from 2013.  (AR 29, 671).  In addition, he noted that Nurse Wasley's

opinion was not consistent with the record as a whole where Myers admitted that she was able to

lift 15 pounds, take walks and improved with treatment.  (AR 29-30, 369, 503, 531-532, 537-

538, 545, 584-585, 646).

Next, Myers argues that the ALJ ignored Dr. Thakur's opinion.  Docket No. 21 at 9.

However, the ALJ explicitly considered it in his decision.[3]  (AR 26).

Similarly, Myers takes issue with the ALJ's RFC findings with respect to her mental

impairments.  Docket No. 21 at 12-13.  First, she argues that there is no support for the ALJ's

finding that she could carry out 2-3 step tasks.  Docket No. 21 at 12.  She states that the state

agency psychologists wrote that she could do only simple tasks in "structured and low stress task

settings."  Id.  In addition, she argues that the ALJ ignored Dr. Haas' opinion that she "may or

may not be capable of completing forms and responding to 2 or 3-step instructions or following

---

[3] The ALJ does not identify Dr. Thakur by name.  But the ALJ's description of the October 2011
consultative examination findings match those contained in Dr. Thakur's report.  Compare AR
26 with AR 576-578.

instructions." Id. Contrary to Myers' arguments, the ALJ did consider Dr. Haas' opinion. (AR 28).[4] However, he noted that medical evidence fell short of demonstrating, among other things, psychological symptoms and limitations so disabling that Myers could not perform any work on a regular and continuing basis. (Id.). He also noted that the record indicated minimal mental treatment since July 2011 and that her psychiatric evaluations were normal in August and October 2012. (Id.). Further, the most recent treatment notes stated that her bipolar disorder was stable. (AR 29).

Second, Myers argues that the ALJ improperly found that she could relate to supervisors on a superficial interactional basis. Docket No. 21 at 12. She observes that the state agency psychologists found that her ability to accept instructions and respond appropriately to criticism was "[n]ot ratable on available evidence." Id. However, the state agency psychologists also stated that Myers would benefit from minimal supervision. (AR 144, 185-186).

In pursuing this argument, Myers highlights Dr. Riley's opinion that Myers was "irritable, angry, moody," "fearful, anxious, avoids people," and that she "tends to withdraw & keep to self, gets anxious around people, had mild panic attacks." Docket No. 21 at 13 (citing AR 495). However, the portion describing Myers as "irritable, angry, and moody" was actually referring to a 1997 hospitalization at Carney Hospital, over a decade before her alleged onset date. (AR 495). In addition, Dr. Riley also observed that Myers was "alert, coherent, calm, and rational" and had a Global Assessment of Functioning (GAF) score of 60.[5]

---

[4] Again, the ALJ does not identify Dr. Haas by name. But the ALJ's description of the October 2011 consultative examination findings match those contained in Dr. Haas' report. Compare AR 28 with AR 571-575.

[5] Prior to 2013, the GAF Scale was used for reporting a clinician's judgment of the individual's overall level of functioning and concerns psychological, social and occupational functioning and, unless otherwise noted, refers to the level of functioning at the time of evaluation. See Am.

Finally, Myers argues that the ALJ simply ignored Myers' history of one or two episodes of decompensation.  Docket No. 21 at 13.  Again, Myers mischaracterizes the ALJ's decision.  He in fact considered that Myers had experienced one to two episodes of decompensation.  (AR 24).  Further, to the extent that Myers is referring to her 1997 hospitalization, that has no relevance to her current claim as it occurred more than ten years prior to her alleged onset date.

In effect, Myers would have this Court reweigh the evidence in the record.  The Court, however, is limited by the standard of review, which requires only that the ALJ's findings be supported by substantial evidence.  See Ortiz, 955 F.2d at 769 ("[T]he resolution of conflicts in the evidence is for the [Commissioner], not the courts.").  The ALJ's reasoning in sufficiently clear and supported by substantial evidence.  Accordingly, the Court declines to remand the case on this basis.

C.      The ALJ Erred In Limiting Myers' Counsel's Cross-Examination
        Of The Vocational Expert Regarding Job Numbers

The ALJ determined that Myers was not disabled at step five of the analysis.  (AR 31-34).  At step five, the ALJ bears the burden of coming forward with evidence of specific jobs in the national economy that the claimant can do based on her residual functional capacity, age, education, and work experience.  See 20 C.F.R. § 404.1520(a)(4); Arocho v. Sec'y of Health and Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).  The ALJ may use testimony from a vocational

---

Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-33 (4th ed., text revision 2000) (hereinafter DSM-IV).  GAF scores are not used in the fifth edition of DSM.  Nevertheless, to the extent that the medical opinions of record were issued prior to 2013, the Court will discuss the GAF scores included in those opinions.  In addition, the SSA has expressly indicated that it will continue to receive and consider GAF scores as opinion evidence.  Administrative Message 13066 (July 22, 2013).

A GAF of 51-60 indicates moderate symptoms such as flat affect or occasional panic attacks or moderate difficulty in social, occupational, or school functioning such as having few friends, or conflicts with peers or coworkers.  DSM-IV 34.

expert to determine the number of jobs available in the national and local economies to a hypothetical claimant with the RFC restrictions the ALJ finds.  Nichols v. Astrue, No. 10-11641, 2012 WL 474145, at *11 (D. Mass. Feb. 13, 2012).  Myers argues that the ALJ erred because he did not allow Myers' counsel to cross-examine Dr. Scorzelli about the reliability of the job numbers he provided.  Docket No. 21 at 13-15.  The Court agrees.

Courts have expressed concern that the job numbers used by vocational experts represent aggregate groupings rather than figures derived solely from the specific DOT classifications. See, e.g., Clark v. Astrue, No. 09-390-P-H, 2010 WL 2924237 (D. Me. July 19, 2010); see also Browning v. Colvin, 766 F.3d 702, 709 (7th Cir. 2014).  Therefore, some courts have found vocational expert testimony inadequate on this basis.  See, e.g., Clark, 2010 WL 2024237, at *3. Another judge in this District found that a vocational expert's testimony did not constitute substantial evidence because it was based solely on the numbers provided by the Job Browser Pro software and did not reflect any expertise on his part.  Dorman v. Social Sec. Admin., No. 12-40023-TSH, 2013 WL 4238315, at *8-10 (D. Mass. May 21, 2013).  In other cases, however, courts have affirmed an ALJ's reliance on similar testimony from a vocational expert because the expert further testified that based on her professional expertise, the numbers derived from the software were accurate.  See, e.g., Poisson v. Astrue, No. 2:11-cv-245-NT, 2012 WL 1067661, at *9 (D. Me. Mar. 28, 2012).

Here, the Court is unable to determine the reliability of Dr. Scorzelli's testimony because the ALJ cut off Myers' counsel questioning of Dr. Scorzelli on this issue.  See, e.g., Skaggs v. Astrue, No. 4:08-cv-0192, 2009 WL 2424544, at *4 (S.D. Ind. Aug. 6, 2009).  Especially in light

of the fact that the Commissioner bears the burden at step 5, the Court finds that remand on this issue is appropriate.[6]

IV.   <u>ORDER</u>

For the foregoing reasons, the Court grants Myers' motion only to the extent that she requests remand and denies the Commissioner's motion to affirm.  The Court remands the case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further findings and/or proceedings consistent with this opinion.

/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge

---

[6] In making its determination, the Court does not consider the portions of the testimony of Dr. Scorzelli in a different and unrelated case that Myers attached to her reply brief.  Docket No. 32 at 8; Docket No. 32-1.